# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JERRY WYAIN GORMAN, JR.,

                                        Plaintiff,

        v.                                       5:12-CV-939
                                                     (LEK/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

---

STEVEN R. DOLSON, ESQ., for Plaintiff
ELIZABETH D. ROTHSTEIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.  PROCEDURAL HISTORY

    On February 11, 2010, plaintiff protectively filed[1] his application for disability insurance benefits, claiming disability beginning March 1, 2009. (Administrative Transcript ("T.") at 12, 110-11). Plaintiff's application was denied initially on May 26, 2010. (T. 67-70), and he requested a hearing before an ALJ (T. 71-72). The

---

[1] When used in conjunction with an application for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. See 20 C.F.R. § 404.630. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

hearing, at which plaintiff testified, was conducted on February 15, 2011. (T. 29-64).

In a decision dated August 26, 2011, the ALJ found that plaintiff was not disabled. (T. 9-28). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 25, 2012. (T. 1-5).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

(1)   The ALJ failed to give proper weight to the treating physician's opinion. (Pl.'s Br. at 3-5) (Dkt. No. 11).

(2)   The ALJ failed to properly consider the effects of plaintiff's non-exertional limitations in determining his residual functional capacity. ("RFC"). (Pl.'s Br. at 5-7).

(3)   The ALJ failed to properly assess plaintiff's credibility. (Pl.'s Br. at 7-9).

Defendant argues that the Commissioner's decision is supported by substantial evidence and must be affirmed. (Dkt. No. 13). For the following reasons, this court agrees with the defendant and will recommend dismissal of the complaint.

## III.   <u>APPLICABLE LAW</u>

### A.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and

the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).   However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## IV.    FACTS

Plaintiff's counsel has included a brief summary of the medical and vocational facts in his brief. (Pl.'s Br. at 1). Defendant has incorporated plaintiff's summary into the defense summary and has supplemented with a substantial statement of additional facts. (Def.'s Br. at 1-16). This court will also incorporate the facts as stated by both counsel, with any exceptions as noted in the discussion below.

## V.    ALJ's DECISION

The ALJ found that plaintiff had a "severe combination of impairments." (T. 14). These impairments are: degenerative disc disease of the cervical spine; obesity; history of gout; meniscal deterioration of the knee; history of carpal tunnel release procedure; sleep apnea; thyroid disease; and gastritis/gastroparesis. (T. 14-15). Although plaintiff claimed additional impairments of hypertension, high cholesterol, and vitamin D deficiency, the ALJ found that these additional impairments were not severe because they were uncomplicated and "adequately controlled" with medication or vitamin supplements. (T. 15). Finally, although plaintiff also alleged fibromyalgia, the ALJ found that this diagnosis was not adequately supported by the record because plaintiff did not have the sufficient number of tender points to support the diagnosis. (*Id.*)

The ALJ also concluded that plaintiff's impairments did not meet the severity of listed impairments. (T. 16). The ALJ considered several of the impairments in the Listing of Impairments in order to reach this conclusion.[2] (T. 15-16). The ALJ was

---

[2] The ALJ considered section 1.02 (major dysfunction of a joint); 1.04 (disorders of the spine); 3.10 (sleep related breathing disorders); 1.00 (musculoskeletal impairments); 5.00 (digestive disorders); 9.00 (endocrine disorders); and 11.00 (neurological disorders). 20 C.F.R. Pt. 404, Subpt.

very specific when discussing plaintiff's impairments and how they related to the Listing of Impairments. (*Id.*)

The ALJ found that plaintiff had the RFC to perform a full range of light work. (T. 16). He could occasionally lift, carry, push or pull 20 pounds, and he could frequently perform those activities with 10 pounds. (*Id.*) He could stand or walk, in combination for six hours in an eight-hour day, with normal breaks. He could sit for 6 hours in an eight-hour day with normal breaks. (*Id.*) The ALJ found that the restrictive RFC submitted by Dr. Margaret Sennett, M.D., plaintiff's treating physician, was not supported by the record and was inconsistent with other substantial evidence, including plaintiff's own reported daily activities. (T. 22). The ALJ also rejected the RFC submitted by a non-examining "Single Decision Maker" ("SDM") because his report did not constitute "opinion evidence" (*Id.*)

In rejecting Dr. Sennett's RFC evaluation, the ALJ reviewed the objective findings in the record and determined that Dr. Sennett's opinion was not consistent with the lack of medical evidence showing that plaintiff was seriously impaired. (T. 22). The ALJ stated that none of the plaintiff's treating sources found muscle atrophy, which would indicate muscle "disuse," and extreme limitation of function. The ALJ also found that Dr. Sennett's RFC evaluation was inconsistent with her own contemporaneous treating notes and appeared to have been completed for the specific purpose of plaintiff's claim for benefits. (T. 22). The ALJ noted that Dr. Sennett recommended that plaintiff begin a walking program in order to lose weight, and that the doctor noted that plaintiff was engaging in activities, such as shoveling, that were

P, App. 1.

inconsistent with disabling pain. The ALJ, thus, found that plaintiff's impairments could cause pain, but that his claims were not credible to the extent that they were inconsistent with an RFC for light work. (T. 18).

The ALJ relied upon the narrative medical report and RFC submitted by consultative physician Kalyani Ganesh, M.D., whose opinion the ALJ found more consistent with the record in its entirety. (*Id.*) The ALJ gave Dr. Ganesh's report "some" weight. (T. 20). The ALJ reviewed the findings from treating orthopedic surgeons, Brian Butzen, M.D. and Carl Schillhammer, M.D., as well as treating neurologist Dr. Jonathan Braiman, M.D. (T. 20-21). Dr. Butzen found that plaintiff's trigger thumb[3] had resolved itself, and Dr. Schillhammer stated that plaintiff's neck pain and subjective numbness did **not** correlate with the imaging studies and the physical examination. (T. 21). Dr. Schillhammer found that plaintiff had herniated discs that could be causing pain, but also found that they were not serious enough to warrant surgical intervention. (*Id.*) Dr. Braiman found that plaintiff had full, active range of motion in his cervical spine, without tenderness; had normal muscle tone and strength in his arms and hands; had normal temperature and sensation in all fingers hands, and arms; and had intact reflexes. (T. 20).

The ALJ also mentioned Dr. P. Sebastian Thomas, M.D., one of plaintiff's pain management physicians, who initially found that plaintiff had 4+/5 motor strength in his upper extremities, and decreased grip strength to 4/5, but that his conditions

---

[3] When plaintiff was having problems with his hands, he saw Dr. Butzen and Dr. Mosher, who originally suspected that plaintiff might need to have surgical "release" of a "trigger thumb." (T. 385). A trigger thumb or trigger finger is a condition that causes the fingers or the thumb to catch or lock when bent. *See* www.webmd.com/osteoathritis/guide/trigger-finger.

improved with medication. (T. 20-21). Dr. Thomas found muscle spasms and tenderness along plaintiff's cervical and thoracic spine, but "no other significant clinical findings were noted." (T. 21). Dr. Thomas also recommended that plaintiff undergo exercise testing and participate in an exercise program. (T. 21).

The ALJ also considered plaintiff's obesity, history of thyroid problems, migraine headaches, sleep apnea, and gastritis.[4] (T. 17). The ALJ determined that plaintiff could not return to his former work, but that he retained the RFC for a full range of light work. (T. 22-23). The ALJ then used the Medical Vocational Guidelines to determine, based on plaintiff's age education and prior work experience, that plaintiff was not disabled. (T. 23).

## VI.   RFC/TREATING PHYSICIAN/CREDIBILITY

### A.   Legal Standards

#### 1.   RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F.

---

[4] Plaintiff claims that when he eats a large meal, he throws up. (T. 48-49).

Supp. 456, 460 (W.D.N.Y. 1987)).

RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute his own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)), *Report-Recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, at *3 (N.D.N.Y. Aug. 2, 2005)). In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

## 2.    Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ."

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d). The ALJ must properly analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32-33.

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

## B. Application

### 1. Treating Physician

The ALJ found that plaintiff could perform a full range of light work, giving Dr. Sennett's RFC, limiting plaintiff to less than sedentary work, "little weight." Plaintiff argues that the ALJ erred in the weight he gave Dr. Sennett's RFC and in affording more weight to Dr. Ganesh's opinion. (Pl.'s Br. at 3-5). One of the bases for this argument is that the ALJ erred in rejecting Dr. Sennett's opinion because it was "based on subjective complaints, and that pursuant to *Green-Younger v. Barnhart*, 335 F.3d 99 (2d Cir. 2003), a treating physician's opinion may be based upon plaintiff's subjective complaints. (Pl.'s Br. at 3-4).

This court finds that the ALJ's opinion was supported by additional evidence in the record, and *Green-Younger* is distinguishable. In *Green-Younger*, the Second Circuit found that the plaintiff's treating physician's diagnosis was "supported by medically acceptable clinical and laboratory diagnostic techniques," and that the diagnosis of fibromyalgia was consistent the American College of Rheumatology

11

guidelines, including "primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points." *Id.* at 107. The court stated that "the fact that Dr. Helfand *also* relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as '[a] patient's report of complaints, or history, is an essential diagnostic tool.'" *Id.* (citation omitted) (emphasis added). The evidence which was "inconsistent" with the treating physician's opinion was not substantial in that it could not "reasonably support the conclusion that [Green-Younger] could work." *Id.*

In contrast, in this case, there is substantial evidence that is inconsistent with Dr. Sennett's restrictive RFC. Dr. Sennett's RFC assessment is set forth in a questionnaire, dated February 9, 2011, in which Dr. Sennett checks various boxes and circles various numbers indicating the plaintiff's restrictions. (T. 318-19). Dr. Sennett estimates that plaintiff can walk less that 100 yards without rest or severe pain and can only sit for 30 minutes before getting up. (T. 318). She also stated that plaintiff could only stand for 20 minutes, and could sit, stand, or walk in combination for less than 2 hours in an 8-hour day. (*Id.*) The report states that plaintiff required "periods of walking" every 30 minutes for approximately 5 minutes. With respect to lifting and carrying, plaintiff could only lift and carry up to 10 pounds occasionally, could occasionally twist and stoop, rarely crouch or squat, and never climb. (T. 319). Dr. Sennett stated that plaintiff would have to be absent from work more than four days per month. With such restrictions, plaintiff would unable to perform even sedentary work.

Dr. Sennett's questionnaire provides no explanation for her findings. When Dr.

Sennett completed the RFC form in February of 2011, it appears from the record that she had not seen plaintiff since October 27, 2010. (T. 352). Generally, Dr. Sennett's contemporaneous treatment notes discuss subjective complaints, but mention very few clinical or examination findings to support those subjective complaints. In fact, often, Dr. Sennett states that she had referred plaintiff to other physicians for his back, neck, knee, wrist impairments, and gastrointestinal impairments. (*See e.g.* T. 221, 227, 229, 352). In the December 11, 2009 report, Dr. Sennett states that plaintiff is morbidly obese, and that she encouraged plaintiff to "begin a walking program." (*Id.*)

Dr. Sennett's October 27, 2010 report states that plaintiff was in her office for a follow-up for hypothyroidism, chronic pain, sleep apnea, and intractable vomiting. (T. 352). Dr. Sennett noted that plaintiff had been to "Pain Management" and had been prescribed Lyrica "which he [was] not taking on a regular basis." Dr. Sennett explained the importance of taking the medication regularly, and then mentioned that plaintiff had a "sleep study" performed. (*Id.*) She mentions that plaintiff was scheduled to see a new gastroenterologist in November of 2010.[5] (*Id.*)

On February 12, 2010, Dr. Sennett mentioned that plaintiff was seen by Dr. Braiman "who finds symptoms suspicious for cervical disc with exacerbation of pain

_____

[5] The court notes that in Dr. Sennett's September 7, 2010 report, she stated that plaintiff was experiencing ongoing diarrhea and vomiting after eating small amounts. (T. 351). Although he had a thorough evaluation from a Dr. Roy, and was told that his problems stemmed from overeating, plaintiff wanted a second opinion from a different gastroenterologist. Dr. Sennett made the referral, and plaintiff ultimately was examined by a third gastroenterologist, Dr. Barbara Peuerstein, on January 5, 2011. (T. 309-311). Dr. Peuerstein stated that there was no clear cut reason for plaintiff's vomiting, and that there was no obvious hormonal problem. (T. 309). She noted that plaintiff was not losing weight, his barium swallow was normal, and he was prescribed medication, but he was not taking it regularly. (*Id.*) The doctor also noted that plaintiff was not having night sweats or hot flashes and his libido was "pretty intact." (T. 310).

into the arms." (T. 227). Dr. Sennett does not include any of her own functional examination findings, but states, based upon Dr. Braiman's findings, that plaintiff has "probable cervical disc," and that they "will proceed to MRI." (*Id.*) On March 29, 2010, Dr. Sennett stated that plaintiff had been seen by Dr. Braiman and "subsequently by Dr. Mosher, a hand surgeon . . . ." (T. 229). Dr. Sennett then stated that the MRI of plaintiff's neck "showed bulging discs, but nothing needing prompt surgical intervention." (*Id.*)

In *Kennedy v. Astrue*, 343 F. Appx. 719, 721 (2d Cir. 2009), the Second Circuit affirmed an ALJ's decision, declining to afford great weight to the treating physician's "check-off form regarding residual functional capacity." The court held that although a treating physician's opinion is generally entitled to deference, that opinion need not be afforded great weight when it is not consistent with other substantial evidence of record, including the opinions of other medical experts. *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In this case, as in *Kennedy*, the treating physician's "form" is not corroborated by the contemporaneous treatment notes, nor is it corroborated by the findings of the specialists who Dr. Sennett references in her contemporaneous reports.

The actual reports, written by the specialists that Dr. Sennett mentions, do not indicate such a high level of restriction. The more complete specialists' reports, contradict the treating physician's conclusory opinion of plaintiff's RFC. In a report, dated February 1, 2010, Dr. Braiman noted that plaintiff had a carpal tunnel release "about 5 years ago." (T. 244). Dr. Braiman also states that over the past couple of years, the plaintiff had some recurrence of the original symptoms of numbness and

tingling, provoked by, among other things, "holding on to things such as vibrating handlebars of a motorcycle." (*Id.*)  The doctor stated that plaintiff "has *mild*, chronic, intermittent neck pain . . . no fixed loss of sensation, [and] no weakness of his hands." (*Id.*) (emphasis added).  Plaintiff's neurological examination and nerve conduction studies were normal. (T. 244-45).  Plaintiff had a full active range of motion in his neck, his cervical spine was "nontender," and he had normal bulk, tone, and normal strength in his arms and hands with intact reflexes. (*Id.*)

Dr. Braiman concluded that given the "normal study . . . and the intermittent nature of his symptoms, he still could be irritating the median nerve within the carpal tunnel during certain situations." (T. 245).  One of the doctor's recommendations was that plaintiff wear "thick gloves when operating vibrating machinery." (T. 245).  This recommendation does not appear to reflect an opinion that plaintiff was totally disabled by his impairments or his pain.

On March 12, 2010, plaintiff had an MRI which showed three disc protrusions.[6] The report states that the disc protrusion at C5-6 is moderate size, with "mild ventral left spinal cord impingement," but no existing neural foraminal stenosis. (*Id.*)  The other two bulges are characterized as "small central dorsal protruding disc[s]," one with mild ventral thecal sac impingement and one without significant thecal sac impingement – and neither showed any central neural foraminal stenosis. (*Id.*)

---

[6] Plaintiff testified, and has told others, that he has **six** herniated discs. (*See* T. 262 - plaintiff tells physical therapist that he has six herniated discs; 309 - plaintiff told one of his gastric consultants that he had six herniated discs).  The March 12, 2010 MRI report shows bulges at C5-6, C6-7, and C7-T1. (T. 233).  The "Impression" states that there is a moderate size dorsal left protruding disc at C5-C6 and "small central dorsal disc herniations" at C6-7 and C7-T1. (*Id.*)  These findings reflect three bulges, not six, however, plaintiff may have seen six numbers and may have misunderstood their significance.

On March 17, 2010, plaintiff saw Dr. John Mosher, M.D., a hand specialist, who noted his disc herniations, examined plaintiff's wrists, and injected Depo-Medrol into plaintiff's right wrist "as a test to see if that relieves his symptoms." (T. 269). On April 7, 2010, plaintiff saw Dr. Braiman again. Dr. Braiman stated that plaintiff underwent an injection that "removed all the pain, numbness, and tingling" on his right [wrist], and he would be returning to the specialist for a left-side injection. (T. 243). Dr. Braiman referred plaintiff to a physical therapist to see if therapy would work on his neck and upper back. (*Id.*) Dr. Braiman stated that plaintiff's EMG nerve conduction study was "unremarkable meaning that it is difficult to localize that pain in his neck and shoulders to one specific spinal level." (*Id.*) Dr. Braiman stated that if plaintiff could not continue his "normal activities" after these conservative measures, he would refer plaintiff to a spine specialist, who could provide "more invasive techniques such as local injections or even surgery." The doctor suggested that plaintiff should "follow up here as needed." (*Id.*)

The record also contains plaintiff's physical therapy records. (T. 251-64, 293-97). Although plaintiff ultimately stated that physical therapy did not help him, the notes from his physical therapy sessions indicate that plaintiff did have some temporary success with therapy. The initial evaluation by the physical therapist was performed on April 14, 2010. (T. 262-64). Several of the tests were deferred due to plaintiff's complaints of pain. (T. 262-63). On April 26, 2010, plaintiff reported that "overall he is doing very well." (T. 256). He was having less pain and less discomfort at the end of the treatment sessions, and he was being "very compliant with HEP."[7]

---

[7] The court assumes that "HEP" stands for Home Exercise Program.

On April 30, 2010, plaintiff reported that he continued to do better overall, and that he was able "to do a lot more exercises and activities." (T. 254). Plaintiff tolerated the treatment well, and he was not having as much pain at the end of the session. (*Id.*) On May 3, 2010, plaintiff was showing improvement in his range of motion and strength. The therapist noted that he was able to do all of the activities "without pain." (T. 253). On May 7, 2010, although plaintiff complained of having "slept wrong" and having muscle spasms, he stated that "he is definitely improving." (T. 252). On June 1, 2010, plaintiff reported soreness at approximately 4/10, but the therapist's assessment stated that plaintiff tolerated the treatment well, and the pain decreased to 0/10 after the exercises. (T. 296). The therapist added that they "[d]id not do mechanical section due to no complaint of pain, ach[e], or discomfort." (*Id.*) The last physical therapy note is dated June 7, 2010, and states that plaintiff reported pain at 3/10. (T. 297). Plaintiff reported no significant change in his activities, "except some increase in driving over the weekend." (*Id.*) Plaintiff tolerated the treatment well, with no increased discomfort after the exercises and decreased pain after traction. (*Id.*)

On August 20, 2010, plaintiff was examined by Dr. Carl K. Schillhammer, M.D. (T. 298-99). Upon review of plaintiff's MRI, Dr. Schillhammer stated that, although the MRI showed protruding discs at three levels, there did not appear to be a significant compression of the nerve roots or cord, and "furthermore" the discs were protruding to the left side of the spinal cord. (T. 298-99). Plaintiff had full strength in his hands and arms. Dr. Schillhammer specifically states that "[i]n review of the patient's MRI and also physical exam, the patient's symptoms do not seem to correlate

with the imaging studies." (T. 299). The disc herniations "may be causing him some pain," but they were not severe enough to warrant surgical intervention. The doctor recommended that plaintiff begin taking Neurontin, as monitored by his primary care physician. Dr. Schillhammer suggested that plaintiff continue physical therapy and referred him for further injections. (*Id.*)

On October 1, 2010, he was examined by Dr. Lesle D. Farr, M.D., who appears to be associated with Dr. Schillhammer. (T. 300). Dr. Farr noted that plaintiff was unable to take the Neurontin due to problems with his stomach.[8] Dr. Farr stated that plaintiff had "some disk bulges but nothing too severe to be causing his symptoms." (T. 300). Although plaintiff was complaining of some pain and numbness in his right arm, he was not complaining of any weakness in either upper extremity, nor was he complaining of dropping things.[9] (*Id.*) Dr. Farr's examination showed that plaintiff had normal sensation in the C1 to T2 distribution, full strength in his biceps, triceps, wrist flexors, wrist extensors, and intrinsics, with good grip strength. (*Id.*) Dr. Farr stated that they had "nothing more to offer him." He recommended that plaintiff follow up with the Pain Clinic, but that no surgical intervention was needed. (*Id.*)

On October 5, 2010, plaintiff began seeing doctors from Upstate Comprehensive Pain Medicine. (T. 365-67). During plaintiff's initial visit, Dr. Sebastian Thomas noted that plaintiff's gait and station were "normal," and that he

---

[8] The court notes that on August 23, 2010, Dr. Sennett stated that plaintiff did not "*start* [the Neurontin] after reading the side effects of the medication." (T. 348) (emphasis added). Once again, Dr. Sennett's medical report contains no specific examination findings and is simply reporting plaintiff's visits to other physicians.

[9] At his hearing in February of 2011, plaintiff testified that he did drop things. (T. 26).

could "undergo exercise testing and/or participate in [an] exercise program." (T. 366). Plaintiff's right and left upper extremity strength were 4+/5, and his right and left lower extremities showed normal range of motion and strength, no joint enlargement or tenerness. (*Id.*) Plaintiff's grip strength was 4/5. Under a section entitled "Problem Assessment," the doctor stated that Cervical Radiculopathy was "Assessed . . . as comment only" by Rickey Kim, D.O. (*Id.*) Muscle spasm was also "Assessed . . . as comment only." Dr. Thomas suggested that plaintiff "restart physical therapy." (*Id.*)

On November 15, 2010, plaintiff reported pain in both arms, but Dr. Donna-Ann Thomas found normal range of motion and strength, no joint enlargement or tenderness in either his right or left upper and lower extremities. Plaintiff underwent a cervical epidural steroid block, which he appeared to tolerate well. (T. 368). Dr. Thomas stated that the cervical radiculopathy and muscle spasm was "Assessed . . . as deteriorated." (T. 369).

On December 9, 2010, Dr. Sebastian Thomas again stated that plaintiff's gait and station were normal, such that he could undergo exercise testing and/or participate in an exercise program. (T. 370). Although there was tenderness to palpation along the right post cervical spine down to the lumbar area, the plaintiff's upper and lower extremities had normal range of motion and strength, with no join enlargement or tenderness. Plaintiff's sensory examination was also normal. (*Id.*) The planned injection was canceled. Dr. Thomas stated that plaintiff had an appointment to see his surgeon to discuss any further recommendations and assess if surgical intervention was appropriate. (T. 371)

On January 21, 2011, Dr. Donna-Ann Thomas stated that plaintiff complained

of radiating neck pain to both arms, but the pain was worse in the neck and upper thoracic region. (T. 372). The doctor stated that plaintiff would be started on a slowly titrating dose of Savella, but she also encouraged a home exercise program and diet modification. Plaintiff's gait and station were normal, but he had multiple trigger points in the cervical and thoracic spine and trapezius. His right and left upper extremities had normal range of motion and strength, with no joint enlargement or tenderness. (*Id.*) A trigger point injection was performed. Dr. Thomas assessed cervical radiculopathy and back muscle spasm as "unchanged." (T. 373).

Plaintiff returned to Upstate Comprehensive Pain Medicine on February 18, 2011, but his injection was canceled due to plaintiff's sinus infection. (T. 375). The next injection was performed on March 4, 2011. (T. 376). The March 4, 2011 report states that plaintiff had trigger points at multiple sites in the posterior neck and thoracic spine. (*Id.*) However, the report also indicates that his muscle spasm was unchanged, but "his pain was back to baseline level," and the cervical radiculopathy was "Assessed . . . as comment only." (T. 377).

On January 7, 2011, plaintiff was examined at Upstate University Hospital by Umesh Metkar, who signs his name "MBBS" (Bachelor of Medicine and Bachelor of Surgery).[10] (T. 380-81). Dr. Metkar's examination revealed full range of motion in plaintiff's cervical spine without any significant tenderness. (T. 380). His upper extremity neurologic examination showed 5/5 strength in bilateral deltoids, biceps, triceps, brachioradialis, and interossei. Sensation was intact, but at C4-T1, there was mild "subjective" loss of sensation in a nonanatomical pattern in both hands. His

---

[10] This appears to be a foreign medical degree.

reflexes were 2+ in his biceps, triceps, and brachioradialis, his lower extremities showed 5/5 strength, he had 2+ reflexes in his knees and ankles, and his gait was normal without alteration. (T. 380-81).

On March 11, 2011, Dr. Brian P. Butzen saw plaintiff for a follow-up appointment. Dr. Butzen noted that an MRI had been ordered to compare to his 2010 MRI. (T. 379). Dr. Butzen commented that the recent MRI showed no interval change in his "disk osteophyte complexes at C5-6 . . . C6-7 and C7-T1." (*Id.*) Although there were some posterior bulges, it did not appear that there was any spinal cord impingement. The doctor stated that because the MRI showed "no interval change and relatively a mild case of the neck arthritis with minimal posterior osteophytes, [it] does not appear that he will require any surgical intervention at this time and for the foreseeable future." (*Id.*) Plaintiff asked Dr. Butzen about seeing a chiropractor, but Dr. Butzen deferred that decision to plaintiff's pain doctors. Plaintiff was warned to be careful of worsening symptoms.

It is apparent that Dr. Sennett was relying upon the specialist's reports in making her determination, and a review of all of the above reports shows that they are more consistent with Dr. Ganesh's examination and RFC.[11] Dr. Ganesh found that plaintiff had no more than minimal to mild limitations in lifting, carrying, pushing or pulling, and no gross limitations in his ability to sit, stand, or walk. (T. 357). Dr.

---

[11] Plaintiff's counsel argues that Dr. Ganesh could not have seen the entire record because the evidence submitted by Upstate Pain Medicine and Upstate University Hospital had not yet been submitted. The court notes that Dr. Ganesh's report is dated April 29, 2011, but the Upstate Comprehensive Pain Medicine reports begin October 5, 2010. (T. 365-67). Dr. Schillhammer's report is dated August 20, 2010, before Dr. Ganesh's report. (T. 298-99). Dr. Farr's report is dated October 1, 2010. (T. 300-301).

Ganesh completed an RFC form in addition to his narrative report, and the form is consistent with the narrative summary of his examination. (T. 358-62). Although the ALJ stated that plaintiff's ongoing treatment for his musculoskeletal complaints, his obesity, and other findings mitigated against finding that he had the ability to do "practically unrestricted" physical activities, Dr. Ganesh's finding that plaintiff had "considerable exertional abilities" was otherwise supported by objective findings and was accorded some weight.[12] (T. 20).

Dr. Sennett, herself, recommended that plaintiff begin a walking program. Plaintiff argues that this statement is not inconsistent with Dr. Sennett's opinion that plaintiff could only walk or stand for two hours per day. That may be true, however, Dr. Sebastian Thomas also stated that plaintiff could undergo exercise testing and/or participate in an exercise program. (T. 370). He did not put any restrictions on "exercise." Dr. Donna-Thomas also suggested a home exercise program. (T. 372). Plaintiff was almost always found to have full strength in all his extremities, and the specialists have commented that the objective evidence indicates that the disc herniations may be causing plaintiff "some" pain, but not serious enough to warrant surgery.

Plaintiff has bilateral knee impairments, but no doctor has ever noted any difficulty in walking, and plaintiff's gait has been normal to the point that the specialists have suggested an exercise program. Therefore, the ALJ had substantial evidence contradicting the treating physician's restrictive RFC.

---

[12] Dr. Ganesh's findings would allow plaintiff to perform considerably more than light work, but the ALJ weighed all the other evidence and determined that plaintiff was limited to light work.

## 2.    Credibility

In making the RFC determination, the ALJ also found that plaintiff's subjective complaints were incredible to the extent that they were inconsistent with an ability to perform light work. (T. 18).  Specifically, the ALJ found that the "claimant's statements regarding his symptoms and functional limitations appear to be overstated." (*Id.*)  The ALJ noted that plaintiff testified that he had "six" herniated discs, however, the MRI showed only three bulges, two of which were minor.[13] (T. 17 (ALJ's decision); 45 (testimony), 233 (MRI report)).  The ALJ also correctly noted that plaintiff maintained that physical therapy did not work, but most of the physical therapy notes show that plaintiff stated he was "improving" and that his pain was less after therapy.[14]  It is unclear why plaintiff stopped attending physical therapy because the reports simply end with a June 7, 2010 report. (T. 297).  There is no discharge

---

[13] As stated above in footnote 5, plaintiff may have misunderstood the MRI findings. However, it is not for this court to make credibility determinations, and plaintiff did misstate the findings.  Plaintiff also told the physical therapist that he had six herniated discs. (T. 279).

[14] Initially, plaintiff complained of pain and soreness after the exercises. (T. 279-80, 282-84). However, by April 22, 2010, he began to report that he was "doing better" and did not have as much pain and discomfort after the treatment session. (T. 285).  By April 26, 2010, he reported that he was "doing very well." (T. 287).  On May 3, 2010, plaintiff reported that he continued to do well and was showing improvement in his range of motion and strength. (T. 290).  He was able to "abolish all soreness with the use of traction. (T. 290).  Although he did occasionally report soreness, he showed "a lot less pain and discomfort into the neck area" and was doing better overall. (T. 291-92).  On May 17, 2010, plaintiff reported soreness of 2/10 when beginning the session, but only had 1/10 level of discomfort after traction. (T. 293).  On May 26, 2010 he was able to complete exercises without increased discomfort. (T. 295).  On June 1, 2010, his pain was at 4/10 when plaintiff began, but no increase in discomfort, and pain decreased to 0/10 after traction (T. 296).  On June 7, 2010, he reported pain at 3/10 when he began the session, no increase in discomfort, and the pain was less following traction. (T. 297).  Although the physical therapy "goals" all state that they were "not met," it is unclear why there are no further records after the June 7, 2010 date.  The June 7, 2010 report states that the plan was to "continue to progress per plan of care." (T. 297).  There is no indication that the sessions were being terminated due to lack of improvment.

note,[15] and Dr. Sebastian Thomas specifically stated that plaintiff should "restart" physical therapy.

On January 28, 2010, Dr. Braiman suggested that plaintiff wear "thick gloves when operating vibrating machinery" because plaintiff told Dr. Braiman that his carpal tunnel symptoms recurred when he was holding the vibrating handles of a motorcycle. (T. 244-45). Dr. Braiman also noted that plaintiff had "mild chronic neck pain." (T. 244). Dr. Sennett reported on March 5, 2010, that plaintiff had pain from "shoveling." (T. 230). Plaintiff argues that this statement supports plaintiff's complaints of pain because the "activity of shoveling caused him enough pain to seek medical treatment." (Pl.'s Br. at 4-5). Plaintiff's argument does not change the court's finding. The fact that plaintiff was shoveling *at all* shows that his activity level was greater than he alleges and greater than Dr. Sennett's estimate. Shoveling can be a strenuous activity that an individual with as much pain as plaintiff claims would not even be able to attempt, particularly an individual who was claiming limitations from wrist, back, and knee impairments, and who testified that he could not bend at the waist to put on his shoes.[16] (T. 61).

Dr. Farr noted that plaintiff had bulging discs, but "nothing too severe to be

---

[15] Plaintiff's counsel states in his brief that plaintiff was discharged from physical therapy for lack of improvement and pain. (Pl.'s Br. at 8). However, counsel does not cite to a physical therapy record for this proposition. He cites to Dr. Sebastian Thomas's initial report, where in the "History of Present Illness" paragraph, it implies that plaintiff told the doctor that he was discharged from physical therapy for those reasons. However, all the physical therapy records support the ALJ's finding that plaintiff improved during physical therapy and had less pain after many of the treatments.

[16] The date of the report indicating that plaintiff hurt himself while shoveling is March 5, 2010. (T. 230). It is unclear what plaintiff was shoveling because the handwriting on the report is practically illegible. However, plaintiff testified at the hearing that he "pretty much never shoveled snow." (T. 58).

causing his symptoms." (T. 300). On August 20, 2010, plaintiff told Dr. Schillhammer that his neck pain was a 5/10, but that the pain did not worsen with activity, and it just stayed the same. (T. 298). Plaintiff also told Dr. Schillhammer that he had some issues with manipulating tools. (*Id.*) Based on these inconsistencies, the ALJ was justified in rejecting plaintiff's credibility to the extent that he claimed his pain would prevent him from performing light work.

Plaintiff argues that the ALJ also failed to consider his good work history in making the credibility determination. While it is true that "a good work history may be deemed probative of credibility," it is only one of the factors that are appropriately considered in assessing credibility. *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (quoting *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)). When the ALJ's analysis contains substantial evidence supporting the conclusion, the fact that plaintiff's good work history is not specifically referenced in the opinion does not undermine the credibility assessment. *Id. See also Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (where other factors, including the inconsistency between Campbell's testimony and his medical records – weighed against a positive credibility finding as to the plaintiff's subjective assessment of the intensity of his symptoms, the ALJ's decision not to rely exclusively on Campbell's good work history was not erroneous).

In this case, the ALJ's credibility assessment was quite detailed and emphasized the inconsistencies between plaintiff's medical condition, his stated limitations, the limitations that he mentioned to the physicians when obtaining treatment, and the extent of his activities. (T. 18-20). An ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v.*

*Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). Thus, in this case, any failure to cite or rely upon plaintiff's "good work history" was not error, and his credibility determination is supported by substantial evidence.

## VII. **STEP 5 DECISION/NON-EXERTIONAL IMPAIRMENT**

### A. **Legal Standards**

Once the plaintiff shows that he cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin*

*v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[17] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen*, 802 F.2d at 603. Rather, only when a claimant's nonexertional limitations "significantly limit the range of work permitted by his exertional limitations" will sole reliance on the Grids be deemed inappropriate. *Id*. at 605-06. A claimant's work capacity is significantly diminished if there is an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 606.

## B.    Application

Plaintiff also argues that the ALJ failed to properly consider the limitations imposed by plaintiff's obesity and other non-exertional impairments.[18] This court

---

[17] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

[18] Plaintiff has various alleged non-exertional impairments, including sleep apnea, thyroid disease, and gastritis, hypertension, high cholesterol, and vitamin D deficiency. The ALJ did not consider the hypertension, high cholesterol or vitamin D deficiency as severe impairments. The ALJ found that the non-severe, non-exertional impairments were only slight abnormalities and were adequately controlled by medication or vitamin supplements. The ALJ found that plaintiff's gout and

does not agree. Plaintiff quotes a Social Security Ruling ("SSR") which states how obesity can cause limitation of functions and may be used in Steps 4 and 5 of the disability analysis. (Pl.'s Br. at 6) (quoting SSR 02-1p). However, counsel also quotes part of the SSR which states that it applies "when the evidence in a case does not include a diagnosis of obesity." (*Id.*) In this case, the ALJ found that obesity was one of plaintiff's severe impairments. (T. 14). The ALJ's decision shows that the plaintiff's obesity was considered in conjunction with all of plaintiff's other severe impairments. *See Miller v. Astrue*, No. 11-CV-4103, 2013 WL 789232, at *10-11 (E.D.N.Y. March 1, 2013) (the ALJ properly considered the plaintiff's obesity when she mentioned obesity as one of plaintiff's severe impairments) (citing *Talavera v. Comm'r of Soc. Sec.*, No. 06-CV-3850, 2011 WL 3472801, at *12 (E.D.N.Y. Aug. 9, 2011), *aff'd*, 500 F. Appx. 9, 11-12 (2d Cir. 2012)). The physicians who examined plaintiff were all aware of his obesity and would have factored this condition into their opinions regarding her capabilities. Thus, the ALJ did not fail to properly "consider" plaintiff's obesity.

Plaintiff argues that the ALJ also failed to consider plaintiff's inability to crouch and/or squat.[19] Counsel cites another SSR, which states that if a person can stoop occasionally, the sedentary and light occupations are virtually intact. (Pl.'s Br. at 6)

---

gastritis were controlled by medications prescribed by Dr. Sennett. (T. 19). The ALJ also found that plaintiff's migraine headaches due to ongoing thyroid problems, sleep apnea, and medication side effects were overstated. (T. 19). The court agrees that the ALJ properly assessed credibility as stated above. Plaintiff's counsel only argues that plaintiff's obesity and his alleged inability to stoop, crouch, or squat reduce the full range of work that he can perform. (Pl.'s Br. at 5-7). Thus, the court will address only plaintiff's argument as it relates to these impairment.

[19] Dr. Ganesh stated that plaintiff could not squat "in full." (T. 355).

(citing SSR 85-15). Dr. Ganesh opined that plaintiff could stoop frequently. (T. 361). Because this court has found that the ALJ's rejection of Dr. Sennett's restrictive RFC was supported by substantial evidence, thus, the ALJ properly found that plaintiff could perform a full range of light work, and did not err in failing to find that any non-exertional impairments would substantially diminish the range of work that plaintiff could perform.

WHEREFORE, based on the findings in the above Report, it is hereby

RECOMMENDED, that the decision of the Commissioner be affirmed, and the plaintiff's complaint DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 28, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge